UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-21864-CIV-ROSENBAUM/SELTZER

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for
BANKUNITED, F.S.B.,

        Plaintiff,
v.

LAW OFFICE OF RAFAEL UBIETA,
P.A., and RAFAEL UBIETA,
        Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on Defendants' Joint Motion to Dismiss or for a More Definite Statement and Incorporated Memorandum of Law [D.E. 8]. The Court has reviewed Defendants' Motion, all supporting and opposing filings, and all other relevant materials in the case file. For the reasons that follow, the Court grants Defendants' Motion to Dismiss Plaintiff's negligent-misrepresentation and breach-of-fiduciary-duty claims with prejudice and Plaintiff's breach-of-contract claim against Defendant Rafael Ubieta without prejudice.

### I. Background

BankUnited, F.S.B. ("BankUnited"), was a casualty of the financial crisis that rocked the United States in 2008. Like most other banks, BankUnited was in the business of funding home mortgages. In connection with this practice, BankUnited funded purchase-money mortgages[1] to both

---

[1] A purchase-money mortgage, as the term is used here, refers to funds that BankUnited loaned to borrowers Leopoldo Silva and Paul Garcia earmarked for the purchase of real property.

Leopoldo Silva (the "Silva Loan") and Paul Garcia (the "Garcia Loan").  *See* Compl. ¶ 9 [D.E. 1], filed May 17, 2012.  It loaned $633,750 to fund the Silva Loan and $543,740 to fund the Garcia Loan.  *See id.* at ¶¶ 9-12.  BankUnited intended for each loan to have a loan-to-value ("LTV") ratio of 75%, which meant that the amounts that BankUnited lent should have represented 75% of each property's purchase price.[2]  Because BankUnited wanted both Garcia and Silva to have some "skin in the game" — *i.e.*, share the risk of foreclosure — Garcia and Silva had to fund the other 25% of the purchase price with money from their own pockets, and not from some other lender.[3]  *See id.* at ¶¶ 22, 37 (noting that "[n]o secondary financing was permitted").

      Before a mortgage is closed, many boxes need to be checked.  So at least one of the parties engages a third party called a "closing agent" to ensure that the conditions of lending have been satisfied and, where they have, to disburse the mortgage funds.  Here, BankUnited contracted with Defendant Law Office of Rafael Ubieta, P.A. ("LORU"), to close both the Garcia and Silva Loans.  *See id.* at ¶¶ 13, 17, 32.  Their arrangement was governed by a straightforward directive: LORU and Rafael Ubieta "were engaged to close [the] Loan[s] in accordance with the[] Closing Instructions and if any of the requirements [could not] be met [LORU] [was] not [to] disburse [any] funds and [was to] contract [*sic*] the Lender IMMEDIATELY [*sic*]."  *Id.* at ¶¶ 19, 34 (emphasis and internal quotation marks omitted).

---

The loans were secured by the properties that Garcia and Silva each purchased.

   [2] The loan-to-value ratio is calculated by dividing the mortgage amount by the appraised value of the property.  *See* Definition of Loan-To-Value Ratio, Investopedia (October 15, 2012), (http://www.investopedia.com/terms/l/loantovalue.asp#axzz29qZfVclw).

   [3] In the real-estate finance world, there is a directly proportional relationship between the LTV ratio and the perceived risk of a loan defaulting—*i.e.*, the higher the LTV ratio, the greater the perceived risk of default.  It is also true that the larger the equity investment, the safer the loan.  Thus, banks will often demand a smaller LTV ratio the greater the borrower's equity investment is.

The Closing Instructions stipulated that no secondary financing was permitted to cover the portion of the sales price that BankUnited's loan did not cover. *See id.* at ¶¶ 22, 37; Ex. A. The instructions also required that LORU submit an executed HUD-1 Settlement Statement and Residential Loan Application Form 1003. *See id.* at ¶¶ 21, 22, 23, 26, 35, 37; Ex. A. If any of these conditions were not met, LORU was directed not to close the mortgages. *See id.* at ¶ 21, 22, 35, 37. In its capacity as closing agent, LORU certified that all the conditions for closing had been met. *See id.* at ¶¶ 23, 24, 38, 39. BankUnited relied on this representation and disbursed the funds tied to the Garcia and Silva Loans. *See id.* at ¶¶ 30, 40.

The Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver for BankUnited, *see id.* at ¶ 2, alleges that LORU erred, in a number of respects, in certifying that both the Garcia and Silva Loans complied with all of the Closing Instructions. First, the FDIC asserts, LORU knew (or should have known) that Garcia and Silva used secondary financing for their down payments — which the Closing Instructions expressly prohibited. *See id.* at ¶ 14. And second, according to the FDIC, LORU "collected funds in a manner inconsistent with the HUD-1 settlement statement," because it indicated that Garcia and Silva had used cash to finance the portion of the purchase price not funded by BankUnited even though that was not the case. *See id.* at ¶¶ 23-24, 38-39.

These alleged missteps were not immaterial to the value of the loans. Because the amount of equity included in a deal is yoked to the LTV ratio a bank offers, both the Garcia and Silva Loans had LTV ratios that were not representative of their risk of default. Put another way, had BankUnited been aware of the actual level of debt encumbering the Silva and Garcia Properties, it would have demanded a lower LTV — to compensate for the increased risk — or simply not funded

the loan. *See id.* at ¶¶ 31, 41. As it turns out, both Garcia and Silva defaulted on their loans, and BankUnited was left with two dramatically undersecured properties. *See id.* at ¶¶ 62, 69.

The FDIC advances contract and tort claims against LORU and its employee who conducted the closing, Rafael Ubieta. The breach-of-contract claims allege that Defendants breached the Closing Instructions by certifying incorrectly that neither Garcia nor Silva used secondary financing for their respective down-payments.[4] *See id.* at ¶¶ 47, 54. The FDIC's claims for negligent misrepresentation and breach of fiduciary duty seek to hold Defendants liable for much the same conduct. *See id.* at ¶¶ 57, 58, 64, 65, 74, 80. Defendants have moved to dismiss the FDIC's negligent-misrepresentation and breach-of-fiduciary claims. And Defendant Rafael Ubieta has moved to dismiss the breach-of-contract claims filed against him in his individual capacity.

## II. Legal Standard

When entertaining a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court assumes that all of the factual allegations in the complaint are true and construes them in the light most favorable to the plaintiff. *See Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citation omitted). The plaintiff must, however, present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[C]onclusory allegations, unwarranted deductions of fact or legal conclusions masquerading as facts will not prevent dismissal." *Bell v. J.B. Hunt Transp., Inc.*, 427 F. App'x 705, 707 (11th Cir. 2011) (per curiam) (citing *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir.2004)).

---

[4] Originally, Defendant suggested that Plaintiff's claims against LORU for breach of contract contained in Counts I and II of the Complaint should be dismissed as outside the statute of limitations. Upon consideration of Plaintiff's Response, however, Defendants conceded that Plaintiff's breach-of-contract action did not seek relief outside the applicable statute of limitations. *See* D.E. 17 at 1 n.1.

*III. Discussion*

The FDIC raises three distinct claims against Defendants — one for breach of contract and the others for negligent misrepresentation and breach of fiduciary duty — but they more or less seek to hold Defendants liable for the same thing: failing to heed BankUnited's Closing Instructions. Defendants call foul and contend that the FDIC cannot use tort law as an end-run to recover more than what BankUnited bargained for when it contracted with LORU to serve as closing agent. Defendants' line of argument finds support in Florida's economic-loss rule, which restricts the ability of parties to a contract to raise tort claims against each other.

### A. The Economic Loss Rule

The economic loss rule is more easily explained than applied. The rule "prevent[s] parties to a contract from circumventing the allocation of losses set forth in the contract by bringing an action for economic loss in tort." *Indemnity Ins. Co. of North America v. American Aviation, Inc.*, 891 So. 2d 532, 536 (Fla. 2004) (citation omitted). It is based on the notion that "parties to a contract have allocated the economic risks of nonperformance through the bargaining process." *Id.* And thus, if parties could obtain by tort what they could not from contract, they, in effect, would be bettering their bargain. While the economic-loss rule has proved difficult to apply in practice, it applies, generally speaking, "where the parties are in contractual privity and one seeks to recover damages in tort for matters arising from the contract." *Royal Surplus Lines Ins. Co. v. Coachman Indus., Inc.*, 184 F. App'x 894, 902 (11th Cir. 2006) (per curiam) (unpublished) (internal quotation marks omitted) (citing *Indemnity Ins.*, 891 So. 2d at 536).

The economic-loss rule initially barred one party from suing another in tort if the parties were in contractual privity. Under current law, however, a plaintiff can maintain, simultaneously, breach-of-contract and tort claims if the alleged tortious conduct relates to acts that "are independent from

[] [those] that breached the contract." *Indemnity Ins.*, 891 So. 2d at 537 (quoting *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996)). This occurs when, for example, the tortious conduct involves pre-contractual misrepresentations that induce the aggrieved party to enter the contract. In that context, the policy underlying the economic-loss rule — protecting the integrity of the contract — is not compromised because the tort claim casts doubt on whether a valid contract even exists. *Cf. Indemnity Ins.*, 891 So. 2d at 544-45 (Cantero, J. concurring) ("When parties can protect their economic interests through contract, it would only undermine contract [] [] law and produce economic inefficiency to allow purely economic recovery in tort.") (citation omitted).

A different rule applies when the tort claims "relate directly to the performance of the contract and are 'inextricably intertwined' with the breach of contract claims." *Lehman Bros. Holdings, Inc. v. Hirota*, No. 8:06-cv-2030-T-24MSS, 2007 WL 1471690, at *3 (M.D. Fla. May 21, 2007) (citing *Behrman v. Allstate Life Ins. Co.*, 388 F. Supp. 2d 1346, 1350 (S.D. Fla. 2005)). In that context, the tort claims do not call into question the contract's validity and thus the economic-loss rule preserves contractual expectations. Defendants contend that because Plaintiff's contract and tort claims both seek to hold Defendants liable for performance-related conduct — certifying incorrectly that the conditions for closing were met — the economic-loss rule applies. The Court agrees.

        1.        **The Negligent Misrepresentation Claims**

Plaintiff observes correctly that tort claims for negligent misrepresentation often go untouched by the economic-loss rule even in cases where the parties are in privity. *See* Resp. 8 [D.E. No. 14], filed on July 12, 2012. But this applies only if the aggrieved party in a breach-of-contract case claims that the alleged misrepresentation "cause[d] [it] to enter into [the] transaction . . . ." *Nationwide Advantage Mortg. Co. v. Fed. Guar. Mortg. Co.*, No. 09-20372-CIV, 2010 WL 2652496,

at *4 (S.D. Fla. Feb. 26, 2010) (internal quotation marks omitted) (citing cases).  Plaintiff contends Defendants' failure to mention in the HUD-1s that both Garcia and Silva used secondary financing to fund their down payments "constituted terms of the bargain to induce BankUnited to enter into the transaction, [and not] an act of performance related to the contractual obligations of the closing instructions."  Resp. 9 (citing *Nationwide Advantage*, 2010 WL 2652496, at * 5).  Because "Defendants' duty to report each transaction accurately on the HUD-1s was independent from their duties under the closing instructions," Plaintiff reasons, the economic-loss rule does not apply.  *Id.* (citation omitted).

Defendants, on the other hand, contend that "LORU's performance obligations to BankUnited under the Closing Instructions unambiguously [] (i) [require] the preparation and submission of a HUD-1 Settlement Statement [] [and] (ii) [] prohibit[] [] secondary financing . . . ."  Defs.' Reply 6 [D.E. No. 17], filed on July 19, 2012 (emphasis omitted).  Thus, LORU's alleged failure to prepare an accurate HUD-1 and its misrepresentation that neither Garcia nor Silva used secondary financing amount to at most a breach of contract for failing to "insure that all closing conditions were cleared prior to the disbursement of the loan proceeds . . . ."  *Id.* at 7.   And the "FDIC should not be permitted to circumvent the contractual arrangement [BankUnited] accepted pursuant to the Closing Instructions in order to obtain a better bargain."  Defs.' Mot. 13.

This Court agrees with Defendants.  BankUnited hired LORU to "close [the Garcia and Silva Loans] in accordance with the [] Closing Instructions."  Compl. Ex. A at 1.   And the Closing Instructions directed LORU to, among other things, (1) certify that no secondary financing was used and (2) send an executed HUD-1 statement to BankUnited.  *See id.*  Thus, contrary to Plaintiff's contention, *see* Resp. 9, Defendants' duty to submit an accurate HUD-1 and report whether Garcia and Silva used secondary financing emanated directly from the Closing Instructions.  Indeed, at one

point in this litigation, Plaintiffs did not disagree. *Compare* Compl. ¶ 47 ("Defendants materially breached the contract with BankUnited by closing the transaction with unpermitted secondary financing, and *failing to provide BankUnited with an accurate HUD-1 Settlement Statement . . . .*") (emphasis added) *with* Resp. 9 ("Defendants' misrepresentations on the HUD-1s constituted terms of the bargain to induce BankUnited to enter into the transaction, not an act of performance related to the contractual obligations of the closing instructions.").

Whether the economic-loss rule bars a negligent-misrepresentation claim depends on whether the misrepresentation occurred during the performance of a contract or induced acceptance of that same contract. *See, e.g.*, *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) ("Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be independent from acts that breached the contract."). Here, it is readily apparent that Defendants' alleged misrepresentations occurred directly in connection with LORU's performance as closing agent. The misrepresentations may have incidentally induced BankUnited to fund loans that with full information it would not have. But this is of limited import. All it means is Plaintiff may recover contractual damages for Defendants' misrepresentations having caused BankUnited to enter a transaction that it would not have but for Defendants' failure to close the loans "in accordance with the Closing Instructions." Compl. Ex. A.

Plaintiff tries to avoid this conclusion and cites a number of cases that it claims establish a per se rule that "in the context of a closing, [] negligent misrepresentation claims are independent and the economic loss rule does not apply . . . ." Resp. 10 (citing *Nationwide Advantage*, 2010 WL 2652496, at *5; *D & M Jupiter, Inc. v. Friedopfer*, 853 So. 2d 485, 487-88 (Fla. 4th DCA 2003) (citation omitted); *Nerbonne, N.V. v. Lake Bryan Int'l Properties*, 689 So. 2d 326, 326 (Fla. 5th DCA 1997)). But Plaintiff's reliance on these cases is misplaced.

First, *Nationwide Advantage* dealt with a question distinct from what is at issue here: whether someone who purchases a group of mortgage loans can sue the seller for fraudulent inducement where the seller maintained falsely that he had full legal rights to the mortgages. 2010 WL 2652496, at *1-*2. The court answered yes but only because the seller's misrepresentation was a "representation of fact," *id.* at *5 n.12, that induced Plaintiff to purchase the loans and did not "relat[e] to the actual performance of [the] agreement," *id.* at *5. Thus, contrary to Plaintiff's contention, *Nationwide Advantage* does not establish that the economic-loss rule has limited application in the closing context.

The same is true of *D & M* and *Nerbonne*. In *D & M*, a purchaser of real property advanced claims for fraud in the inducement and negligent misrepresentation against the seller for misrepresenting the property's draining capacity. 853 So. 2d at 486-87. As here, the seller contended that because the two parties were in privity, the economic-loss rule barred the purchaser's tort claims. The *D & M* panel disagreed. It posited that because the misrepresentation was in connection with a *term* of the bargain — the property's propensity to flood — rather than a failure to perform the heart of the agreement, the economic-loss rule did not apply. *See id.* at 487 (noting that for the economic-loss rule not to apply when parties are in contractual privity, the "fraud must be in a term of the bargain and not in an act of performance") (citing *Allen v. Stephan Co.*, 784 So. 2d 456, 457 (Fla. 4th DCA 2000)).

*Nerbonne* is similarly inapposite. In that case, the plaintiff corporation sued one of its officers, among others, for breach of fiduciary duty for conspiring with third parties to sell a piece of real estate to the corporation for far more than the price at which they purchased it. *See Nerbonne*, 689 So. 2d at 324. The defendants argued that the economic-loss rule barred plaintiff's tort claim because the parties were in a relationship of privity. *See id.* at 326. But, as in *D & M*, the

panel declined to apply the economic-loss rule because the plaintiff's tort claim related to "matters that predate[d] the purchase of the real property" — that is, its fiduciary's conduct in conspiring with third parties to obtain the plaintiff's agreement to the contract in the first place. *See id.*

Here, by contrast, Plaintiff alleges only that LORU, *in its capacity as closing agent*, did not perform as directed. But this, of course, is not conduct that pre-dates the formation of LORU's agreement with BankUnited, as in *D & M* and *Nerbonne*. Nor did LORU's substandard performance as a closing agent render its agreement with BankUnited void from the outset. *See, e.g.*, *Luigino's Int'l, Inc. v. Miller*, No. 08-13663, 2009 WL 330861 (11th Cir. Feb. 11, 2009) (holding that when two parties are in contractual privity, the economic-loss rule does not bar a tort claim when the contract was "totally incapable of performance"). Rather, the conduct for which Plaintiff seeks to hold Defendants liable in tort is LORU's failure to perform as promised in the contract; that is, its failure to close the mortgages "in accordance with the Closing Instructions." The economic-loss rule thus applies wholesale.

Notably, Plaintiff fails entirely to address why the Middle District of Florida's analysis in *Lehman Brothers Holding, Inc. v. Hirota* — a factually indistinguishable case — should not govern here. No. 08:06-cv-2030-T-24MSS, 2007 WL 1471690 (M.D. Fla. May 21, 2007). There, as here, the plaintiff Lehman Brothers advanced claims for breach of contract, breach of fiduciary duty, and negligent misrepresentation against a number of closing agents it hired to close a group of mortgages because they "permitted secondary financing of the properties," in violation of the closing instructions. *See id.* at *1; Lehman Brothers Holdings, Inc.'s Am. Compl. ¶ 40, No. 08:06-CV-02030-SCB-MSS [D.E. No. 68] (M.D. Fla. Dec. 13, 2006). The closing agents countered that the economic-loss rule applied because Lehman Brothers "should not be permitted to better its bargain by converting its breach of contract claims into [a] tort claim[] for . . . negligent misrepresentation.

. . ." *Hirota*, 2007 WL 1471690, at *3.  The court agreed.  It noted that because Lehman Brothers "allege[d] in every claim that the [closing agents] were wrong in permitting the [b]orrower[s] [] to close on loans using secondary financing . . . [t]he[] allegations relate[d] directly to the breaching party's performance of the contract and [were] 'inextricably intertwined' with the breach of contract claims."  *Id.* (quoting *Behrman v. Allstate Life Ins. Co.*, 388 F. Supp. 2d 1346, 1350 (S.D. Fla. 2005)).

While the *Hirota* Court's analysis of state law is, of course, not binding, it is certainly persuasive.  And in light of the deep factual similarities between this case and *Hirota*, the Court can find no reason — nor has Plaintiff supplied one — why the *Hirota* Court's analysis of the economic-loss rule should be disregarded.  In sum, because Plaintiff's breach-of-contract claims are inextricably intertwined with its negligent-misrepresentation claims, the economic-loss rule prohibits Plaintiff from suing in tort for conduct that is already covered by its contract claim.

### 2.     The Breach-of-Fiduciary-Duty Claims

Plaintiff argues that even if the economic-loss rule bars its negligent misrepresentation claims, it does not touch its breach-of-fiduciary-duty claims because claims for breach of fiduciary duty are exempt from the economic-loss rule.  Plaintiff is mistaken.  Contrary to Plaintiff's contention, neither *Moransais v. Heathman*, 744 So. 2d 973 (Fla. 1999), nor *Invo Fla., Inc. v. Somerset Venturer, Inc.*, 751 So. 2d 1263 (Fla. 3d DCA 2000) (per curiam), established the bright-line rule that the economic-loss rule never applies to breach-of-fiduciary-duty claims.

In *Moransais*, the Florida Supreme Court held only that the economic-loss rule did not bar a tort claim for *professional negligence* against an employee of an engineering company with whom the plaintiff was in privity.  744 So. 2d at 983.  The court's decision can certainly be read broadly to mean that the economic-loss rule does not apply to any tort claims advanced against employees

of a company with whom a plaintiff is in privity. But subsequent cases make clear that the *Moransais* exception to the economic-loss rule applies only to suits for professional negligence. And, more importantly, Moransais leaves untouched the rule that a tort plaintiff cannot sue a corporation's employee in tort "when [it] is barred by the economic loss rule from suing [the] corporation in tort." *Vesta Constr. v. Lotspeich & Assocs.*, 974 So. 2d 1176, 1181 (Fla. 5th DCA 2008). A contrary rule would, after all, "completely undermine the contractual privity economic loss rule to allow any party which contracts with a corporation to avoid the rule by simply bringing its tort claim directly against the . . . the employee[] tasked with performing the contract on behalf of the corporation." *Id.*

*Invo* also does not dictate the result Plaintiff suggests here. There, two parties, Invo and Somerset Venturer, entered into a settlement agreement under which the plaintiff Invo was granted a right of first refusal to purchase the sole asset of Somerset's business. *See Invo*, 751 So. 2d at 1263. Somerset did not honor the right of first refusal and sold the business's asset to family members of one of the company's principals "in a scheme to transfer the property . . . so that Invo would not be able to reach it . . . ." *See id.* at 1266. Invo sued Somerset and two of its principals (individually and as trustees for Somerset's assets) for breach of contract and breach of fiduciary duty. The court held that the economic-loss rule did not bar the breach-of-fiduciary-duty claim because the defendants' fiduciary duties as directors "of a dissolved corporation" did not emanate from the right of first refusal it entered into with Invo. *See id.* at 1267. Rather, it owed a duty to "exercise diligence and good faith in dealing with the properties of the corporation" to all of its creditors (Invo being one of them) irrespective of any contract. *See id.* And so, as in *Moransais*, the court made clear that the existence of a contract is necessary but not sufficient to trigger the economic-loss rule.

The salient difference between this case and *Invo* is that here Defendants' alleged breach of the fiduciary duty they owed BankUnited is almost inseparable from the conduct Plaintiff alleges qualifies as a breach of contract. For both claims, Plaintiff seeks to hold Defendants liable for "preparing and submitting a HUD-1 Settlement Statement that did not accurately" reflect the method of financing that the borrowers used to fund their down payments. *See* Resp. 12. In *Invo*, by contrast, the plaintiff's breach-of-contract and breach-of-fiduciary-duty claims were based on wholly separate conduct: the former was based on defendants' failure to honor the right of first refusal; the latter on defendants' alleged scheme to put out of Invo's reach the property to which it had a right of first refusal. Plaintiff's reliance on *Invo* is thus misplaced — it neither establishes a per se exception to the viability of the economic loss rule in the breach-of-fiduciary-duty context nor is it factually similar to this case.[5]

Because the Court knows of no case establishing that breach-of-fiduciary-duty claims are different enough to warrant a *per se* exception to the economic-loss rule, the Court must apply the default rule: when two parties are in privity, the economic-loss rule bars tort claims that seek to hold a defendant liable for acts that also breached the contract. And here, Plaintiff's breach-of-fiduciary-duty claim seeks to hold Defendants liable for the same conduct as its breach-of-contract claims: failing to adhere to the Closing Instructions. Plaintiff's breach-of-fiduciary-duty claims are thus dismissed.

---

[5] As Defendants correctly note, *see* Mot. to Dismiss 10-12; Reply 3, the more appropriate case from which the Court should draw is, again, *Lehman Brothers Holdings v. Hirota*, where the court dismissed both Lehman Brothers negligent-misrepresentation *and* breach-of-fiduciary-duty claims. In the part of the court's analysis where it dealt with the breach-of-fiduciary-duty claims, the court maintained that because Lehman's "breach of fiduciary duty claim [was] based on the same conduct that provides the basis of its breach of contract claim," it is barred by the economic-loss rule. *Hirota*, 2007 WL 1471690, at *5. While the Court need not follow the *Hirota* Court's analysis on a question of state law, the Court finds it noteworthy that Plaintiff fails even to mention the seminal case on which Defendants rely.

### B. Plaintiff Cannot Sue Rafael Ubieta in His Individual Capacity for Breach of Contract

Plaintiff advanced breach-of-contract claims against both LORU and its agent, Rafael Ubieta — the individual who signed the Closing Instructions on behalf of LORU. When, as here, a plaintiff sues a corporation's agent, that plaintiff faces the foundational principle that the corporate form protects agents of the corporation from being held personally liable. The only exception to this rule is piercing of the corporate veil. To do this, a plaintiff must allege that "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Gaspirini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2009) (per curiam) (citation omitted).

Plaintiff fails entirely to address whether any of these facts exist and instead claims that it need not pierce LORU's corporate veil because "Florida's Professional Association Practices Act expressly provides for liability against a professional for the 'negligent or wrongful acts or misconduct . . . committed by that person.'" Resp. 14 (citing Fla. Stat. § 621.07 (2012)). The problem with Plaintiff's contention arises from the fact that the Act applies only to tort actions. First, the language of the statute speaks in tort terms. Second, if the Act applied to contract actions, corporate structure would be meaningless in contractual actions because contractual signors on behalf of corporations could always be sued in their individual capacities for any causes of action relating to the contract, including breach of contract. And tellingly, Plaintiff has not provided the Court with even a single case interpreting the Act to apply to breach-of-contract claims. The Court declines Plaintiff's invitation to be the first to do so.

Therefore, Plaintiff must pierce the corporate veil in order to hold Rafael Ubieta personally liable for LORU's alleged breach.  As a result, Plaintiff must set forth facts indicating that LORU was "formed or used for some illegal, fraudulent, or other unjust purpose which justifies piercing of [its] corporate veil."  *Dania Jai Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984) (citation omitted).  Plaintiff's Complaint, however, is deficient in this respect and does not come close to satisfying the pleading standard of Rule 8, Fed. R. Civ. P.  Thus, because Plaintiff has not alleged sufficient, much less any, facts to suggest that the Court should disregard the corporate form and allow Plaintiff to hold Rafael Ubieta liable in his individual capacity for LORU's alleged breach of contract, its breach-of-contract claim against Ubieta is dismissed without prejudice.

### *IV. Conclusion*

For the foregoing reasons, the portions of Defendants' Joint Motion to Dismiss or for a More Definite Statement and Incorporated Memorandum of Law [D.E. No. 8] remaining after Defendants' filing of their Reply in support of their Joint Motion to Dismiss or for a More Definite Statement (*see supra* at note 4) is **GRANTED.**  It is hereby **ORDERED and ADJUDGED** that Counts I and II are dismissed without prejudice against Defendant Rafael Ubieta and Counts III, IV, V, and VI are dismissed with prejudice.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 29th of October 2012.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

Copies:     The Honorable Barry S. Seltzer, Chief United States Magistrate Judge

Counsel of Record